**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DENTSPLY SIRONA INC.; VDW GMBH; and MAILLEFER**
**INSTRUMENTS HOLDING SARL, d/b/a Dentsply**
**Maillefer,**

                                        **Plaintiffs,**

            **vs.**                                    **3:16-cv-00806**
                                                       **(MAD/DEP)**

**L I K SUPPLY, CORP.; LIDIYA KAGAN; and**
**VLADIMIR PAKHOMOV,**
                                        **Defendants.**
_____

**APPEARANCES:**                       **OF COUNSEL:**

**BOND, SCHOENECK LAW FIRM**               **KATE I. REID, ESQ.**
Syracuse Office
One Lincoln Center
Syracuse, New York 13202
Attorneys for Plaintiffs

**GOODELL, DEVRIES LAW FIRM**        **CHERYL ZAK LARDIERI, ESQ.**
One South Street                     **MATTHEW D. KOHEL, ESQ.**
20th Floor                           **RICHARD M. BARNES, ESQ.**
Baltimore, Maryland 21202
Attorneys for Plaintiffs

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On July 5, 2016, Plaintiffs Dentsply Sirona Inc. ("Dentsply"), VDW GmbH ("VDW"), and

Maillefer Instruments Holding Sarl, d/b/a Dentsply Maillefer ("Maillefer") (collectively

"Plaintiffs") commenced the instant action against Defendants L I K Supply Corp. ("LIK

Supply"), Lidiya Kagan, and Vladimir Pakhomov (collectively "Defendants") alleging various

trademark violations. *See* Dkt. No. 1. On July 7, 2016, the Court issued an Order to Show Cause

why it should not grant Plaintiffs' requested emergency relief. *See* Dkt. No. 13. Plaintiffs served

the Order to Show Cause on Defendants that same day. Dkt. No. 19. Defendants failed to respond to this order by the expedited deadline set forth therein. Currently before the Court is Plaintiffs' unopposed emergency motion for a preliminary injunction and expedited discovery.[1] *See* Dkt. Nos. 6, 7, 13.

## II. BACKGROUND

Plaintiff Dentsply is a large manufacturer and distributer of dental products and technologies. Dkt. No. 6-1 at 8. Dentsply has used several trademarks in its dental instruments, including the following: DENTSPLY®, ProTaper®, AH Plus Jet®, WaveOne®, WaveOne® design and logos, ProTaper Next®, ThermaFil®, RECIPROC®, and Endo Easy Efficient® (collectively the "Dentsply Trademarks"). *Id.* Dentsply holds registrations for these trademarks with the United States Patent and Trademark Office ("PTO"). *See* Dkt. No. 6-3 at 1-43.

Plaintiff VDW is a global manufacturer and distributor of state-of-the-art endodontic instruments. Dkt. No. 6-1 at 9. In connection with its dental instruments, VDW has used and/or holds an exclusive license to use the trademarks VDW® and Mtwo® (the "VDW Trademarks"). *Id.* VDW holds registrations for these trademarks with the PTO. *See* Dkt. No. 6-3 at 1-43.

Plaintiff Maillefer is a global manufacturer and distributor of state-of-the-art endodontic instruments and became a part of Dentsply companies in 1995. Dkt. No. 6-1 at 10. Maillefer specializes in the design, manufacture, and commercialization of dental instruments for the treatment of root canals. *Id.* Maillefer has used the following trademarks in connection with its dental supplies: Maillefer®, Flexofile®, Colorinox®, and Lentulo® (the "Maillefer

---

[1] Although Plaintiffs' motion is labeled as also requesting a temporary restraining order, the Court will only address it as if seeking only a preliminary injunction as no relief has been granted prior to Defendants' having an opportunity to respond to Plaintiffs' allegations.

Trademarks"). *Id.* Maillefer holds registrations for these trademarks with the PTO. *See* Dkt. No. 6-3 at 1-43. The Dentsply, VDW, and Maillefer trademarks are referred to collectively as "Plaintiffs' Trademarks."

Plaintiffs allege that Defendants "are not, and have never been, authorized to advertise, promote, sell, or offer to sell Plaintiffs' products or goods or the Plaintiffs' Trademarks." Dkt. No. 6-1 at 11. Nonetheless, Plaintiffs allege that Defendants "run an internet counterfeiting operation that advertises and distributes knock-offs of Plaintiffs' medical devises . . . ." *Id.* at 7. Specifically, Defendants allegedly use the internet and catalogues to "advertise, . . . offer for sale, and . . . sell counterfeit dental products bearing the Plaintiffs' Trademarks." *Id.* at 11.

On March 13, 2014, Defendant Kagan, on behalf of LIK Supply, allegedly sent an advertising email offering to sell "replica" Dentsply and Maillefer Products. *See id.* at 45-50. This email states, in relevant part, as follows: "We are propose [sic] the best material and attractive price from DENTSPLY MAILIFIER [sic]. Please compare the prices for original products and replica!! All replica products have the excellent quantity!!" *Id.* at 45. Additionally, the email contained photos of what are purported to be "original products and replicas." *See id.* at 46-50.

On October 1, 2014, Maillefer sent Defendants a letter demanding that they "immediately cease and desist from any and all offering for sale, sale [sic], distribution, importation, manufacture, advertisement, promotion and/or display of the Counterfeit Dental Products." *Id.* at 53. The letter further demanded confirmation that Defendants have stopped the infringing activity and will not resume it in the future. *Id.*

On October 19, 2014, Defendants responded to Maillefer's letter. *See id.* at 55-56. This response states that Defendants "buy and sell Mailifier [sic] products from different companies

from China and India. . . . We sell this products [sic] through e-bay and to other small company. . . . We never sell this products [sic] to doctor office." *Id.* at 55. Further, Defendants stated that they "also buy Chinese copy/ replica/ of Mailifier [sic] products and sell through e-bay and to other company [sic] but we make strong notice that this Products id [sic] REPLICA . . . ." *Id.* at 56.

On January 14, 2015, Defendant Kagan, as President of LIK Supply, sent Maillefer a second email responding to the cease and desist letter. *See id.* at 61. This email states as follows: "According to your notice from October 1 2014 we are closed [sic] all purchase and proposition of any Mailifer [sic] products. including of our Ebay page- spny007." *Id.*

On February 23, 2015, Defendant Kagan allegedly sent another advertising email offering various dental products, including those purporting to be from VDW and Maillefer. *See id.* at 64. This email states, in pertinent part, "[w]e are propose [sic] the best endodontics materials from top brands companies . . . 2. NI-TI rotary file: please see attractive price for . . . MTWO and RECIPROC, Protaper Next and WAVE ONE. 3. Gutta -Percha- please see excellent GP from DIADENT for Protaper, Protaper NEXT, RECIPROC, WAVE ONE . . . ." *Id.* Attached to this email was a catalogue with the header "Offer #2 February -March 2015 ENDO!! ENDO!! ORIGINAL!!" *Id.* at 66. This catalogue offers numerous products, including VDW's Mtwo and RECIPROC endodontic files, Maillefer's ProTaper Next and WaveOne endodontic files, and Maillefer's AH-Plus Jet root canal sealers. *Id.* at 66-71.

Plaintiffs concede that Defendants no longer operate their Ebay store under the username "spny007." Dkt. No. 6-1 at 13. However, as of April 25, 2016, Defendants maintained an advertising and sales site on tradekey.com. *See* Dkt. No. 6-3 at 73. This site states, in relevant part, as follows: "WE SELL RIGHT NOW the different dental supplies/ cosmetic dentistry/

endodontic materials / from . . . DENTSPLY . . . CAD CAM technology hand and rotary endodontic instruments.  We sell just original products in original package." *Id.*  Defendant Pakhomov is listed on this website as the contact person as executive manager of LIK Supply.  *Id.*

On March 1, 2015, March 22, 2015, April 6, 2015, May 25, 2015, and July 6, 2015, Medizin und Dentalhandels-GmbH ("MD Trade"), an Austrian distributor of dental products, purchased several products from Defendants on the internet that were purported to be RECIPROC and Mtwo files.  *See* Dkt. No. 7-3 at ¶ 5; Dkt. No. 7-4 at 2-7.  MD Trade resold some of the products it purchased from Defendants to two other European dental product distributors, Pluradent and Proclinic.  Dkt. No. 7-3 at ¶ 6; Dkt. No. 7-4 at 9-17.

On or about August 25, 2015, Dr. Winfried Zeppenfeld, a well-known German endodontist, sent an email to Markus Borgshulte and Alfons Guggenmos, VDW's head of research and development and account manager, respectively.  Dkt. No. 7-5 at ¶ 5; Dkt. No. 7-1 at ¶ 5.  This email described that Dr. Zeppenfeld purchased certain Mtwo files from Pluradent that he suspected were counterfeit products.  Dkt. No. 7-6 at 3.  Dr. Zeppenfeld identified several differences between the files he believed were counterfeit and the authentic files.  *Id.* at 3-10.

On or about September 3, 2015, Dr. Zeppenfeld sent Mr. Borgschulte a letter explaining that he inspected his entire inventory of Mtwo instruments and identified several "counterfeit" products.  *Id.* at 15.  Dr. Zeppenfeld sent these allegedly counterfeit products to Mr. Borschulte. *Id.*  On September 14, 2015, Dr. Zeppenfeld sent a followup email to Mr. Guggenmos explaining his dealings with the "counterfeit" instruments.  *See* Dkt. No. 6-3 at 93.  Dr. Zeppenfeld explained that he "treated at least two patients who probably suffered damage from these faked instruments."  *Id.*  In one case, "there was a ledge in a curved canal," which meant he "could not prepare the apical part of the original canal."  *Id.*  In the second, he fractured an instrument during

use, which could not be removed.  *Id.*  Dr. Zeppenfeld also had a colleague that fractured multiple instruments that appeared to be counterfeits.  *Id.*

On September 7, 2015, Sascha Johansen, VDW's brand manager, received and inspected the allegedly counterfeit instruments sent by Dr. Zeppenfeld.  Dkt. No. 7-9 at ¶¶ 4, 9.  Mr. Johansen compared the batch numbers on the instruments with those kept by VDW and determined that the instruments provided by Dr. Zeppenfeld were not authentic products produced by VDW.  *Id.* at ¶ 11.

On September 24, 2015, VDW issued a press release about the allegedly counterfeit Mtwo files that were purchased by Dr. Zeppenfeld.  *See* Dkt. No. 6-3 at 96.  That press release states, in relevant part, "Fake Mtwo instruments have been discovered in a dental practice.  The quality of these products is significantly different from that of the original made by the manufacturer, VDW in Munich."  *Id.*  VDW also uploaded two documents to its website comparing the authentic Mtwo instruments and packaging to the instruments and packaging of the instruments purchased from Defendants.  *See* Dkt. No. 7-2 at 61-69.

On or about September 15, 2015, the allegedly counterfeit instruments were sent to Nicolas Crevoisier, a laboratory engineer for Maillefer, for further testing.  *See* Dkt. No. 7-7 at ¶¶ 5-6.  Mr. Crevoisier stated that, upon an initial examination, "the counterfeit instruments appeared to [him] to be originals."  *Id.* at ¶ 8.  However, after extensive testing, he determined that the "quality of the counterfeit instruments is significantly less than Plaintiffs' authentic instruments" and they are "less resistant to fatigue than the originals [and] pose[] a higher risk of instrument fracture due to fatigue."  *Id.* at ¶¶ 16-18; *see also* Dkt. No. 7-8.

On or about October 23, 2015, Mr. Guggenmos and Mr. Johansen met with the general manager of MD Trade, Damasus Stumptner.  Dkt. No. 7-3 at ¶¶ 3-4.  During this visit, Mr.

Stumptner advised that he had purchased the purported VDW products via the internet from LIK Supply.  *Id.* at ¶ 5.  Mr. Johansen took MD Trade's stock of approximately 1,100 blister packs to VDW's facility in Munich for testing.  Dkt. No. 7-9 at ¶ 13.  After conducting a batch number comparison of the products, Mr. Johansen concluded that only 150 of the blister packs were originals and the remaining 950 were counterfeit products.  *Id.* at ¶ 13.

## III. DISCUSSION

**A.    Preliminary Injunction**

*1. Standard of review*

In the Second Circuit, where a party seeks preliminary injunctive relief in an action alleging trademark infringement under the Lanham Act, courts apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 390 (2006).  Under that standard, preliminary injunctive relief should issue where the plaintiff has established a likelihood of success on the merits, and that: (1) the plaintiff is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate the plaintiff for that injury; (3) the balance of hardships tips in the plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction.  *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay*, 547 U.S. at 391, 126 S. Ct. 1837).[2]  "A showing of irreparable harm is the single most important prerequisite for the issuance

---

[2] In *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010), the Second Circuit extended the test articulated by *eBay*, a patent action involving a permanent injunction, "to preliminary injunctions in the context of copyright cases[.]"  Although the Second Circuit did not explicitly extend the *eBay* test to trademark actions, the Court stated that it saw "no reason that *eBay* would not apply with equal force to an injunction in *any* type of case."  *Id.* (emphasis in original) (noting that "*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context").  In light of *Salinger*, district courts in this Circuit have extended *eBay* to trademark actions as well.  *See, e.g., U.S. Polo Ass'n, Inc. v. PRL*

of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted).

Although irreparable harm may not be presumed upon a showing of a likelihood of success, *see eBay*, 547 U.S. at 393; *Salinger*, 607 F.3d at 80, "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011). Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm. *See Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (stating that "although a likelihood of confusion does not create a presumption of irreparable injury, a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury," and that "[a] plaintiff may also show a threat of irreparable injury by showing a threatened loss of good will and loss of ability to control its reputation").

Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires. "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the

---

*USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (applying *Salinger*'s extension of *eBay* in a trademark action) (citing *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 265 (E.D.N.Y. 2011); *NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010)).

granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted).

In the Second Circuit "there is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Md. Cas. Co. v. Realty Advisory Bd. of Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 (2d Cir. 1989)). "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Id.*

### 2. Likelihood of Success

"The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir. 1987). "Confusion giving rise to a claim of trademark infringement includes [but is not limited to] confusion as to 'source, sponsorship, affiliation, connection or identification.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006) (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005)). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.*

Pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(l)(a), trademark infringement exists where a person uses in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark, without the registrant's consent, in connection with the sale, offering for sale, distribution or advertising of any goods or services, where such use is likely to cause confusion, or to cause mistake or to deceive. "The essential question in any case

of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 924 (S.D.N.Y. 1981).

It is well settled that a licensee's sale of unauthorized goods, *i.e.*, products outside of the license, is likely to confuse the public into believing that such products are in fact manufactured or authorized by the trademark owner. *See Baskin Robbins Ice Cream Co. v. D&L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983); *see also* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:30 (4th ed.) (noting that "any sales of goods . . . under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark").

In order to establish a claim for trademark infringement, a plaintiff must show: (l) ownership of a valid mark entitled to the protection of the law; and (2) defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the defendant's goods. *See Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006) (citing *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004)); *see also E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 292 (S.D.N.Y. 2000) ("The likely confusion may relate to the source of the product . . . or to affiliation with or sponsorship of the alleged infringer by the trademark owner").

### a. Plaintiffs' Valid Trademarks

Once a trademark is registered by the PTO, the registration serves as *prima facie* evidence of the mark's validity. *See* 15 U.S.C. § 1115(a); 15 U.S.C. § 1057(b); *see also Fusco Grp., Inc. v. Loss Consultants, Int'l, Inc.*, 462 F. Supp. 2d 321, 327 (N.D.N.Y. 2006).

Here, Plaintiffs hold a certificate of registration with the PTO for each of the trademarks discussed herein. *See* Dkt. No. 6-3 at 1-43. Defendants have not disputed this *prima facie* evidence of Plaintiffs' validly held trademarks.

### b. Likelihood of Confusion

Generally, in determining the likelihood of confusion, courts in the Second Circuit are obliged to consider the eight factors set forth by Judge Friendly in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961):

> (i) the strength of the plaintiff's mark;
>
> (ii) the similarity of the parties' marks;
>
> (iii) the proximity of the parties' products in the marketplace;
>
> (iv) the likelihood that the plaintiff will bridge the gap between the products;
>
> (v) actual confusion;
>
> (vi) the defendants' intent in adopting their mark;
>
> (vii) the quality of the defendants' product; and
>
> (viii) the sophistication of the relevant consumer group.

*Id.* at 495–96; *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006).

Here, Plaintiffs have provided significant evidence of a likelihood of confusion between their products and Defendants' allegedly infringing products. Plaintiffs contend that their trademarks are well known as a result of their longstanding businesses and global products recognition. In its verified complaint, Plaintiffs state that "[s]ince Dentsply's formation in 1899, it has grown into the largest manufacturer of professional dental products and technologies in the

11

world.  With operations in 40 countries, Dentsply distributes its dental products in over 120 countries under some of the most well-established brand names in the dental industry."   Dkt. No. 1 at ¶ 17.

The similarity of the parties marks are nearly identical, and require close laboratory analysis to determine the allegedly counterfeit products from the authentic ones.  Nicolas Crevoisier, a laboratory engineer trained by Plaintiff Maillefer and familiar with its products, stated that, upon an initial examination, "the counterfeit instruments appeared to [him] to be originals."  Dkt. No. 7-7 at ¶ 8.  It was only after additional laboratory testing that Mr. Crevoisier discovered that Defendants' products were of a "significantly less" quality than Plaintiffs'.  *Id.* at ¶ 16.  Moreover, Dr. Zeppenfeld, an accomplished endodontist, required close examinations under a microscope to discover the differences between the products.  Dkt. No. 7-6 at 3-10. Accordingly, even to well-trained individuals, the marks appear to be nearly identical without close laboratory examinations.  Thus, it is highly unlikely that an unsuspecting or untrained purchaser of the products would have any recognition that Defendants' products are not authentic.

The proximity of the parties' products in the marketplace create a significant likelihood of confusion.  When dental supplier MD Trade purchased what it thought were Plaintiffs' authentic products, the packages that it received from Defendants contained a mix of counterfeit and original products.  Dkt. No. 7-9 at ¶ 13.  Further, the dentists that used these products received both counterfeit and original products in the same shipments.  *See* Dkt. No. 7-6 at 3. Accordingly, Defendants' allegedly counterfeit products are intermixed and shipped together with Plaintiffs' authentic products, making it nearly impossible for an unsuspecting purchaser to know what product he or she is receiving.

Plaintiffs' have established that there has been actual confusion between the parties' products both by dental suppliers and by the dentists who actually use the products. Supplier MD Trade was confused by Defendants' product when it purchased what it thought were approximately 1,100 authentic blister packs from VDW. Dkt. No. 7-9 at ¶ 13. In reality, this shipment contained only 150 authentic products and the remaining 950 were Defendants' allegedly counterfeit products. *Id.* Moreover, Dr. Zeppenfeld stated that he and his colleagues used Defendants' products on their dental patients, believing that they were authentic products. Dkt. No. 7-6 at 3. Thus, there has been actual confusion by the purchasing public between the parties' products.

Defendants' intent in adopting Plaintiffs' marks appears to be for the purpose of making a profit by selling what is purported to be a high quality product at a significantly discounted price. Further, Defendants' appear to be attempting to deceive their customers into thinking that they are purchasing Plaintiffs' authentic products. In an emailed products catalogue, Defendants promote "ORIGINAL!!" products purporting to be from Plaintiffs. Dkt. No. 6-3 at 66. Further, in their tradekey.com website, Defendants state that "[w]e sell just original products in original package." *Id.* at 73. In an email to Plaintiffs, Defendants acknowledge that they are not selling original products and state that they believe their business is an "absolutely normal practice." *Id.* at 56. Accordingly, it appears by the advertisements and communications between the parties that Defendants are attempting to deceive the public into purchasing what are purported to be genuine dental products at a discounted price.

After extensive laboratory testing, Plaintiffs' laboratory engineers determined that "the quality of [Defendants'] counterfeit instruments is significantly less than Plaintiffs' authentic instruments" and they are "less resistant to fatigue than the originals [and] pose[] a higher risk of

13

instrument fracture due to fatigue."  Dkt. No. 7-7 at ¶¶ 16-18; *see also* Dkt. No. 7-8.  Moreover,

Dr. Zeppenfeld stated that he and his colleagues likely experienced at least four negative

experiences with Defendants' products that led to complications with dental procedures.  Dkt. No.

6-3 at 93.  Thus, the Court finds that Plaintiffs' have established that Defenedants' allegedly

counterfeit products are of a substantially lesser quality than their authentic counterparts.

The facts presented in this case are most alarming given the highly sophisticated nature of

the individuals that use these products, who have nonetheless been unable to protect themselves

or their patients from injury caused by Defendants' counterfeits.  Based on the foregoing, the

Court finds that Plaintiffs have sufficiently established a likelihood of confusion between the

products.  Thus, Plaintiffs' unopposed submissions have sufficiently shown a likelihood of

success on the merits of their trademark infringement claims.

### 3. Irreparable Harm

A hallmark of irreparable harm in a trademark infringement suit is the inability of a mark

holder to control the public perception of the quality of its products.  *See Zino Davidoff SA v. CVS

Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("Where the alleged infringer has interfered with the

trademark holder's ability to control quality, the trademark holder's claim is not defeated because

of failure to show that the goods sold were defective.  That is because the interference with the

trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder

to the risk of injury to the reputation of its mark"); *see also El Greco Leather Prods. Co. v. Shoe

World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) ("One of the most valuable and important

protections afforded by the Lanham Act is the right to control the quality of the goods

manufactured and sold under the holder's trademark. . . .  For this purpose the actual quality of the

goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain") (citations omitted).

The continuation of Defendants' sale of infringing products would undoubtedly result in irreparable harm to Plaintiffs' business reputation. VDW has been required to issue a press release about the allegedly counterfeit products and the harm that these products may cause to patients. *See* Dkt. No. 6-3 at 96. Moreover, its website includes information about the potentially dangerous products. *Id.* This notification that purchasing what are purported to be Plaintiffs' products may be hazardous to a patient is likely to result in a decreased confidence in Plaintiffs' products, which have achieved a status of reliability over their many years of production.

### 4. Balance of Hardships

In the present matter, the Court finds that the balance of hardships weighs heavily in Plaintiffs' favor in view of the established irreparable harm and the likelihood that the infringing conduct is likely to continue. *See Hilton v. Int'l Perfume Palace, Inc.*, No. 12-CV-5074, 2013 WL 5676582, *13 (E.D.N.Y. Oct. 17, 2013) (citation omitted). The only hardship that Defendants will suffer is that they will have to stop advertising and selling counterfeit products that infringe on Plaintiffs' trademarks. *See Tyr Sport, Inc. v. Tyr Natural Spring Water, Inc.*, No. 3:12-cv-761, 2013 WL 2455925, *4 (D. Conn. June 5, 2013) ("The balance of the equities also weighs heavily in the plaintiff's favor, because the only hardship [the defendant] will suffer from this injunction will be that he must cease engaging in further illegal activity").

### 5. Public Interest

Finally, the Court finds that the public interest is served by an injunction in this case. In this case, "the public has an interest in not being deceived – in being assured that the mark it

associates with a product is not attached to goods of unknown origin and quality." *NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) (citing *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980)) (other citation omitted). The Court is highly troubled by the alleged complications that the use of Defendants' products have caused dental patients in this case. No member of the public should be put in a position of experiencing unknown and additional risks caused by Defendants' allegedly improper actions while undergoing a highly complex dental procedure.

Based on the foregoing, the Court finds that Plaintiffs have established their entitlement to a preliminary injunction.

### 6. Security Requirement

Generally, Federal Rule of Civil Procedure 65(c) requires "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" prior to granting a preliminary injunction. FED. R. CIV. P. 65(c). However, a district court "may dispense with the posting of security entirely where the parties sought to be enjoined or restrained 'have not shown that they will likely suffer harm absent the posting of a bond.'" *Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 399 (N.D.N.Y. 2001) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)).

In light of Defendants' failure to respond to the instant Order to Show Cause, the Court finds that there is no need for Plaintiffs to post a security bond to receive the preliminary injunction. Significantly, Defendants' sent Maillefer an email on January 14, 2015 that stated they are ceasing all purchasing and promotion of Maillefer's infringing products. Further, Plaintiffs concede that they could no longer find Defendants' Ebay store under the username

"spny007" selling the infringing products online. *See* Dkt. No. 6-1 at 13. Accordingly,

Defendants' appear to concede that they should no longer be selling counterfeit products bearing

Plaintiffs' trademarks. Moreover, the instant preliminary injunction does not seek to suspend all

of Defendants' sales of dental products from all of its sources, rather only those that use Plaintiffs'

trademarks without authorization. As evidenced by Defendants' numerous advertising emails and

catalogues, it appears that they sell, and may continue to sell, a variety of other non-infringing

dental products. *See, e.g.*, Dkt. No. 6-3 at 66-71. Thus, the Court finds that there is no likelihood

of harm to Defendants' business by granting the instant preliminary injunction and Plaintiffs are

not required to post a security bond in this case.

**B.     Expedited Discovery**

     A request for expedited discovery is to be analyzed in light of the following factors:

> (1) irreparable injury, (2) some probability of success on the merits,
> (3) some connection between the expedited discovery and the
> avoidance of the irreparable injury, and (4) some evidence that the
> injury [that] will result without expedited discovery looms greater
> than the injury that the defendant will suffer if the expedited relief
> is granted.

*Cecere v. Cnty. of Nassau*, 258 F. Supp. 2d 184, 186 (E.D.N.Y. 2003) (quoting *Gidatex, S.R.L. v.*

*Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998)).[3]

     As explained above, Plaintiffs have satisfied the first two elements. The alleged

connection between the expedited discovery and the irreparable injury is that Plaintiffs are

unaware at this point of "the identity of the source of the counterfeit products, where the products

are being stored, the identity of the purchasers, and any other participants in the unlawful

---

[3] Plaintiffs also contend that 15 U.S.C. § 1116(d)(10)(b) permits expedited discovery in
this case. *See* Dkt. No. 6-1 at 30. However, that section only applies if the court has issued an
order of seizure, which Plaintiffs have not sought in this case.

conduct." Dkt. No. 6-1 at 30. This unknown information can likely be discovered through discovery of Defendants' business records and depositions of Defendants' business employees and executives.

With respect to the fourth factor, there is a high risk that significant injury could result from doctors using Defendants' allegedly counterfeit products. At least four incidents of dental complications have been reported to Plaintiffs already, and it is unknown the amount of counterfeit products that are on the market. It is remarkable that MD Trade had a supply of approximately 950 counterfeit products in its storage, which could have potentially been distributed throughout the would without quick action on Plaintiffs' behalf to ensure quality control of its products. Without expedited discovery, it is impossible for the parties to know how many other large scale distributors have warehouses full of Defendants' allegedly counterfeit products waiting in stock and ready to ship out to unsuspecting customers. While Plaintiffs have attempted to notify their regular purchasers that there are counterfeit products in the marketplace, these notifications have been sent only to known customers. There is a potential that other suppliers that are not ordinarily direct purchasers of Plaintiffs' products have not been brought to Plaintiffs' attention and, thus, are unaware of the potential danger posed by Defendants' products. Accordingly, the Court finds that Plaintiffs' are entitled to expedited discovery in this case.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, Plaintiffs' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction is **GRANTED**; and the Court further

**ORDERS** that Defendants, their officers, agents, employees, assigns, successors-in-interest, and attorneys, and all those acting in active concert or participation with Defendants, **shall be prohibited from the following acts** during the pendency of this action:

(i)     using in commerce, in connection with the offering for sale, sale, distribution, or advertising of, any goods that use any reproduction, counterfeit, copy, or colorable imitation of one or more of Plaintiffs' trademarks, including the words DENTSPLY®, Mtwo®, WaveOne®, WaveOne® design and logos, RECIPROC®, ProTaper®, ProTaper Next®, VDW®, Flexofile®, Endo Easy Efficient®, AH Plus Jet®, Maillefer®, ThermaFil®, Colorinox®, and Lentulo® and any related designs and logos, separately or in combination with any reproduction, counterfeit, copy, or colorable imitation of any one or more of the aforementioned trademarks, or any mark likely to be confused with any of Plaintiffs' trademarks, alone or in combination with any other symbol, symbols, word, or words, in such a manner as is likely to cause confusion, deception or mistake;

(ii)    passing off, inducing or enabling others to sell or pass off any product as a product produced or authorized by Plaintiffs, which is not produced or authorized by Plaintiffs;

(iii)   shipping, delivering, distributing, returning or otherwise disposing of in any manner, any items currently in Defendants' possession or control (whether goods, instruments, packaging, product parts, labels, documents, or otherwise) which bear

any of Plaintiffs' registered trademarks identified in paragraph (i) above, or any copy or reproduction of the registered marks, or any substantially identical mark;

(iv)     manufacturing or using any tools, dies, stamping, mixing, embossing, silk screening, printing, or molding equipment, or any other apparatus designed especially for the manufacture or labeling of unauthorized products bearing any of Plaintiffs' registered trademarks identified in paragraph (i) above, or the manufacturer or labeling of containers bearing any of the registered trademarks, or the creation of advertising display material bearing any of the registered trademarks; and

(v)     continuing to perform in any manner whatsoever any acts that infringe Plaintiffs' registered marks identified in paragraph (i) above or attempt to pass-off counterfeit products purporting to be Plaintiffs' products;

and the Court further

**ORDERS** that Plaintiffs are not required to post a bond or undertaking as security for granting the above-mentioned preliminary injunction; and the Court further

**ORDERS** that, pursuant to Federal Rules of Civil Procedure 26, 30, 33, 34, and 36, Plaintiffs shall be entitled to conduct expedited discovery from Defendants as follows:

(i) Plaintiffs shall be entitled to serve discovery immediately upon Defendants–i.e., before the parties have conferred pursuant to Federal Rule of Civil Procedure 26(f) and Local Rule 16.1 or made their initial disclosures pursuant to Rule 26(e)–including but not limited to discovery by way of depositions, interrogatories, requests for production, requests for admissions, and third-party discovery; and

(ii) Defendants shall respond to up to 15 interrogatories, pursuant to Rule 33 and/or 15 requests for production of documents, electronically stored information, and tangible things, pursuant to Rule 34, not later than five (5) days after such discovery requests are served upon them by Plaintiffs. Service of such discovery requests shall be deemed good and sufficient if made upon one of the individually named Defendants, or upon counsel, should counsel appear for Defendants in this action. Service may also be made by first class mail, in which case Defendants shall have seven days from the date of mailing to respond to the discovery requests. Absent further order of this Court, additional interrogatories and/or requests for production shall be subject to the times for response prescribed by the Federal Rules of Civil Procedure; and

(iii) Defendants shall additionally provide up to five (5) witnesses for deposition, pursuant to Rule 30, not later than five (5) days after Plaintiffs serve them with notices of depositions for such witnesses' testimony. Service of such deposition requests shall be deemed good and sufficient if made upon one of the individually named Defendants, or upon counsel, should counsel appear for Defendants in this action. Service may also be made by first class mail, in which case Defendants shall have seven days from the date of mailing to respond to the deposition requests. Absent further order of this Court, the notice period for additional depositions shall be subject to the times for response prescribed by the Federal Rules of Civil Procedure and case law interpreting them; and

(iv) pending the final disposition of all claims in this lawsuit, Defendants shall preserve all documents, electronically stored information, and/or tangible things that may be relevant to the subject matter of, or reasonably calculated to lead to the discovery of admissible

evidence in, this action or any of the claims asserted herein and maintain them in an

accessible form and place, including without limitation any counterfeit products bearing

Plaintiffs' trademarks as listed above in their possession, custody, or control.

and the Court further

**ORDERS** that Plaintiffs or their counsel shall effect personal delivery of a copy of this

Memorandum-Decision and Order by first class mail and email to Defendants and/or Defendants'

designated counsel; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  July 15, 2016
        Albany, New York

Mae A. D'Agostino
U.S. District Judge