**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DENTSPLY SIRONA INC.; VDW GmbH; and**
**MAILLEFER INSTRUMENTS HOLDING**
**SARL d/b/a/ DENTSPLY MAILLEFFER,**

                            **Plaintiffs,**

      **vs.**                                **3:16-cv-806**
                                           **(MAD/DEP)**

**L I K SUPPLY, CORP.; LIDIYA KAGAN; and**
**VLADIMIR PAKHOMOV,**

                            **Defendants.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**GOODELL, DEVRIES LAW FIRM**      **CHERYL ZAK LARDIERI, ESQ.**
One South Street                         **MATTHEW D. KOHEL, ESQ.**
20th Floor                                **RICHARD M. BARNES, ESQ.**
Baltimore, Maryland 21202
Attorneys for Plaintiffs

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On July 5, 2016, Plaintiffs Dentsply Sirona Inc. ("Dentsply"), VDW GmBH ("VDW"), and

Maillefer Instruments Holding Sarl, d/b/a Dentsply Maillefer ("Maillefer") (collectively

"Plaintiffs") commenced this action against Defendants L I K Supply Corp. ("LIK Supply"),

Lidiya Kagan, and Vladimir Pakhomov (collectively "Defendants") alleging Defendants engaged

in various trademark violations, false advertising, unfair competition, and unjust enrichment. *See*

Dkt. No. 1.  On July 13, 2016, Plaintiffs filed an amended complaint.  *See* Dkt. No. 17.  When

Defendants failed to answer or otherwise respond to the amended complaint, Plaintiffs obtained a

Clerk's entry of default.  *See* Dkt. No. 27.  Plaintiff now moves for default judgment against Defendants pursuant to Rule 55(b) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 42.

## II. BACKGROUND

Since Plaintiff Dentsply's formation in 1899, it has grown into the largest manufacturer of professional dental products and technologies in the world.  *See* Dkt. No. 17 at ¶ 17.  With operations in 40 countries, Dentsply distributes dental products in over 120 countries under some of the most well-established brand names in the dental industry.  *See id.*  Formed in 1972, Plaintiff VDW is a global manufacturer and distributor of state-of-the-art endodontic instruments, "and is looked to and relied upon by dental professionals for high quality and innovated products." *Id.* at ¶ 18.  Plaintiff Maillefer was formed in 1889 and is based in Ballaigues, Switzerland.  *See id.* at ¶ 19.  Maillefer is considered the world leader in the design, manufacture and commercialization of dental instruments for the treatment of root canals.  *See id.* Since 1995, Maillefer has been part of the global Dentsply family of companies.  *See id.*

Defendant LIK Supply is a corporation organized under the laws of the State of New York, with its principal place of business located in Kew Gardens, New York.  *See id.* at ¶ 14. Defendant Lidiya Kagan is a citizen of the State of New York and is the President, Owner and/or Chief Executive Officer of LIK Supply.  *See id.* at ¶ 15.  Defendant Vladimir Pakhomov is a citizen of the State of New York and is an officer, manager, employee and/or agent of LIK Supply.  *See id.* at ¶ 16.

Dentsply has used in connection with its dental instruments many trademarks including, but not limited to, the following trademarks: DENTSPLY®, ProTaper®, AH Plus Jet®, WaveOne®, WaveOne® design and logos, ProTaper Next®, ThermaFil®, RECIPROC® and Endo Easy Efficient® (collectively the "Dentsply Trademarks").  *See* Dkt. No. 17 at ¶ 4.  VDW

has used in connection with its dental instruments many trademarks including, but not limited to, the following trademarks: VDW® and Mtwo®[1] (collectively the "VDWTrademarks"). *See id.* at ¶ 5. Maillefer has used in connection with its dental instruments many trademarks including, but not limited to, the following trademarks: Maillefer®, Flexofile®, Colorinox®, and Lentulo® (collectively the "Maillefer Trademarks"). *See id.* at ¶ 6. The Dentsply Trademarks, the VDW Trademarks, and the Maillefer Trademarks are collectively referred to herein as "Plaintiffs' Trademarks."

According to the amended complaint, Defendants have engaged, and continue to engage, in the manufacturing, advertising, promotion, distribution, sales, and/or offering for sale products bearing Plaintiffs' Trademarks, logos and source-identifying information, and products that are counterfeit and inferior in quality to Plaintiffs' products. *See* Dkt. No. 17 at ¶ 29. Without authorization, Plaintiffs contend that Defendants use Plaintiffs' Trademarks on their dental instruments and packaging in which such instruments are sold, as well as in their advertising and promotional materials. *See id.*

Defendants, via catalogues and the internet (including but not limited to the websites eBay and TradeKey), offer and/or have offered for sale and have in fact sold counterfeit dental products purportedly manufactured by Plaintiffs, bearing Plaintiffs' Trademarks, logos and source-identifying information. *See id.* at ¶ 30. According to the amended complaint, Defendants offer for sale and in fact sell infringing and counterfeit products bearing Plaintiffs' Trademarks in various countries, including the United States, Spain, Switzerland and Germany. *See id.* at ¶ 31.

---

[1] Sweden & Martina is the owner of the registered trademark "Mtwo®". Sweden & Martina has granted Plaintiff VDW an exclusive license to use the trademark, globally, except in Italy, and has executed an Authorization, wherein Sweden & Martina "authorizes VDW as exclusive licensee to enforce its trademark rights against infringements of third parties judicial and extrajudicial."

Defendants are not, and have never been, an authorized manufacturer, retailer, wholesaler, promoter, distributor, licensee, importer or exporter of Plaintiffs' merchandise or goods. *See id.* at ¶ 32. In addition to Defendants' admissions that they willfully and knowingly promote, advertise, and offer for sale counterfeit and infringing products, Plaintiffs claim that examinations and analyses of Mtwo® endodontic files sold by Defendants have shown them to be counterfeit, and that Plaintiffs' Trademarks on the instruments and packaging are not authentic. *See id.* at ¶ 33; *see also* Dkt. Nos. 17-3 & 17-4.

On March 22, 2015, April 6, 2015, May 25, 2015, and July 6, 2015, Medizin und Dentalhandels-GmbH ("MD Trade"), an Austrian distributor of dental products, purchased what were purported to be genuine Mtwo® files on the internet from Defendants. *See* Dkt. No. 17 at ¶ 34; Dkt. No. 17-9 at ¶ 5. In the LIK Invoices, Defendants give the counterfeit products an "Item Number." *Id.* at ¶ 35. Among the various Item Numbers listed in the March 22, 2015 Invoice to MD Trade are V041234025010, V041236025025, V040235025030, and V040234025035. *See id.* Plaintiffs obtained files with these item numbers and they proved to be counterfeit. *See id.*

MD Trade resold some of the Mtwo® files that it purchased from Defendants to Pluradent and Proclinic, two other distributors of dental products in Europe. *See id.* at ¶ 36; Dkt. No. 17-9 at ¶ 6. On or about August 25, 2015, Dr. Winfried Zeppenfeld, a German endodontist, who purchased files from Pluradent, sent an email with photographs to Markus Borgschulte, VDW's Head of Research and Development, and to Alfons Guggenmos, VDW Account Manager. *See id.* at ¶ 37. In his email, Dr. Zeppenfeld reported his suspicion that he purchased a counterfeit Mtwo® file from Pluradent. *See id.*; Dkt. No. 17-6 at ¶ 5; Dkt. No. 17-10 at ¶ 5. Dr. Zeppenfeld's August 25, 2015 email identified several differences between the file and an authentic Mtwo® file, including differences in size and color. *See id.* at ¶ 37.

On or about September 3, 2015, Dr. Zeppenfeld sent Mr. Borgschulte a letter concerning Defendants' counterfeit Mtwo® files and differences between those files and Plaintiffs' authentic files. *See* Dkt. No. 17 at ¶ 38. In pertinent part, the letter states that the products have the "'[w]rong colors, smeared color, stoppers that are not flat on the surface and have a rounded edge, wrong diameters, wrong grinding depths, as well as tips that are too wide and spatula-shaped in the case of the 25/06 instruments. I also saw a corroded tip on one instrument.'" *Id.* (quoting Dkt. No. 17-10 at 15-24). In that letter, Dr. Zeppenfeld also identified the following files that he purchased from Pluradent as counterfeit Mtwo® files: Mtwo 25 mm 25106 Batch 084346, Mtwo 25 mm 30/05 Batch 0711310516, Mtwo 25 mm 35/04 Batch 0711310616, and Mtwo 25 mm 10/04 Batch 099683. *See id.* at ¶ 38 n.8; *see also* Dkt. No. 17-10 at 18. Dr. Zeppenfeld enclosed the Mtwo® files to Mr. Borgschulte with his letter. *See id.*

The "charge" numbers identified by Dr. Zeppenfeld are the "charge" numbers in the Pluradent invoices that pertain to certain instruments that he bought from that company. *See* Dkt. No. 17 at ¶ 39. The Pluradent "charge" numbers match the "lot" numbers found on Defendants' infringing and counterfeit packaging. *See id.* For example, charge number "0711310516" for a size 35/04 Mtwo® file in the Pluradent invoice corresponds with "Lot 0711310516" on the label for Defendants' counterfeit size 35/04 Mtwo® file. *See id.* In addition, the label that bears "Lot 0711310516" also bears "V04233025035," which is one of the Item Numbers in the March 22, 2015 LIK Invoice to MD Trade. *See id.* Plaintiffs checked Defendants' lot numbers against VDW's internal reference numbers (what VDW refers to as "batch numbers"), and determined that these files were not authentic. *See id.*

Dr. Zeppenfeld followed up with Mr. Guggenmos in an email on September 14, 2015, where he explained how he "treated at least two patients who probably suffered damage from

these faked instruments." *Id.* at ¶ 40; Dkt. No. 17-6 at ¶ 11. According to Dr. Zeppenfeld, in one patient, Defendants' counterfeit instrument most likely caused "a ledge in a curved canal . . . which lead [sic] to a guarded prognosis concerning the outcome." *Id.* During his treatment of the other patient, Dr. Zeppenfeld stated that the fake instrument "fractured" and "could not be removed." *Id.* After this event, Dr. Zeppenfeld "checked the tips of these instruments under the microscope and found a spade-shape of the tip which differs quite a bit from the original." *Id.* He explained to Mr. Guggenmos that "[t]his spade-shape bites a lot more than the original round-trip [sic] and makes it easier to fracture the tip in the canal. This was the case that made me suspect that the instruments were faked." *Id.*; *see also* Dkt. No. 17-6 at 61.

Mr. Borgschulte was on a business trip when the counterfeit instruments arrived at VDW, so Mr. Guggenmos retrieved the parcel from Mr. Borgschulte's office and delivered it to Sascha Johansen, VDW's Brand Manager. *See* Dkt. No. 17 at ¶ 41. The parcel contained the four Mtwo® files that Dr. Zeppenfeld listed in his September 3, 2015 letter. *See id.* Mr. Guggenmos instructed Mr. Johansen to check the lot or batch numbers on the files sent by Dr. Zeppenfeld to determine whether they were authentic or fake. *See id.* at ¶ 42. If the batch numbers on the packaging of the products sold by Defendants did not correspond to VDW's internal batch numbers, that would indicate that they were fakes. *See id.* Mr. Johansen compared the batch numbers of the files received from Dr. Zeppenfeld with VDW's batch numbers and concluded that the four Mtwo® files were not legitimate VDW products. *See id.*

Plaintiffs claim that they also comprehensively examined and tested the counterfeit instruments received from Dr. Zeppenfeld and concluded that, to the naked eye and upon initial examination, the counterfeit instruments look similar to the original. *See id.* at ¶ 43. Upon closer examination, however, "several differences and defects . . . were observed," including the

following: (1) higher internal core diameter of the cross section; (2) strange tip shape observed on the ISO 025 (not well grounded); (3) rounded shape of the depth ring instead of being flat; (4) differences on the painting colours used on the shaft; (5) painting overfilled on the depth and on the colour rings; (6) rounded RA shape compared to the original one; (7) diameter at 3 and 13 mm often out of the original drawing tolerance range; (8) torque resistance (Mt) clearly higher than the current production range (+35%); (9) similar average torque angle (At) compared to the production range; (10) bending resistance (Mf) clearly higher than the current production range (+40%) meaning lower flexibility; and (11) lower fatigue resistance (-17%) compared to the original instrument. *See id.*; *see also* Dkt. No. 17-8 at ¶ 15.

According to Plaintiffs, the overall quality of Defendants' counterfeit instruments do not meet Plaintiffs' high quality standards. *See id.* at ¶ 44. Further, Plaintiffs claim that Defendants' inferior, counterfeit and infringing products are causing health risks to patients. *See id.* at ¶ 45; Dkt. No. 17-6 at ¶¶ 11-12. Plaintiffs claim that the patient health risk is so great that VDW issued a press release stating as follows:

> Fake Mtwo instruments have been discovered in a dental practice. The quality of these products is significantly different from that of the original made by the manufacturer, VDW in Munich. At first glance, the fakes are not easy to identify as the blister packaging and labels are almost identical to the original. As two incidents involving the treatment of patients have already been reported, it is critical to urgently warn dentists against the use of fake products.
>
> The fake instruments have a larger diameter than the original instruments (Fig. 1, measured at 9 mm from the tip). This not only reduces the depth of the flutes (deep flutes prevent debris from accumulating in the canal) but also the flexibility of the instrument. Hence, they are more stiff. Further testing shows that the fakes have an average of 40% less bending strength than the originals.
>
> This rigidity increases the risks of creating ledges (no uniform conical shape of canal) and the shifting of the canal axis in curved canals.

> Cutting edges and blades of the fake [instruments] are significantly less clear-cut than the original. Flutes for the removal dentine debris are also shallower (higher risk of debris accumulation in the canal).
>
> The design of the instrument tip deviates significantly from the original (Fig. 2, ISO size 25/40) which may result in incomplete preparation (reduced working length).
>
> At 3 mm and 13 mm from the tip, the diameters often exceed the permissible production tolerance limit. Hence, the instrument sizes do not correspond with their ISO sizes, which will result in the over-preparation of the root canal and difficult fitting of gutta-percha cones for obturation. The fake instruments are on average 17% less resistant to fatigue than the originals, posing a higher risk of instrument (fatigue) fractures.[2]

Dkt. No. 17 at ¶ 46; Dkt. No. 17-12.

On or about October 23, 2015, Mr. Guggenmos and Mr. Johansen went to MD Trade's facilities and met with Damasus Stumptner, the General Manager and MD Trade, and Thomas Rieder, MD Trade's lawyer. *See* Dkt. No. 17 at ¶ 48. During the meeting, Mr. Stumptner gave Mr. Johansen MD Trade's inventory of VDW products. *See id.* Mr. Stumptner advised Mr. Guggenmos and Mr. Johansen that MD Trade purchased these instruments over the internet from Defendants, which is confirmed by Defendants' invoices. *See id.*; *see also* Dkt. No. 17-7 at ¶ 14; Dkt. No. 17-6 at ¶ 16. Mr. Johansen took the stock of purported VDW products that were given to him by MD Trade to Plaintiffs' facility in Munich, Germany. *See id.* at ¶ 49. Mr. Johansen compared the batch numbers of the files that he was given by MD Trade to VDW's batch numbers and found that, out of the 1,100 blister packs of instruments, only 150 blister packs were

---

[2] The Press Release indicated that the tested products were sold by Pluradent. Pluradent purchased the products from MD Trade, which in turn purchased them from Defendants. *See* Dkt. No. 17-9 at ¶¶ 5-6.

Plaintiffs' genuine instruments. *See id.*; *see also* Dkt. No. 17-7 at ¶ 13; Dkt. No. 17-6 at ¶ 15. The other 950 blister packs contained counterfeit VDW endodontic files. *See id.*

According to Plaintiffs, Defendants have no license, authority, or other permission from Plaintiffs to use any of Plaintiffs' Trademarks in commerce in connection with the manufacturing, advertising, promoting, distributing, selling and/or offering for sale of the counterfeit and infringing products. *See id.* at ¶ 51. Defendants have been previously advised by Maillefer that their conduct is illegal and have been requested to cease and desist. *See id.* at ¶ 52; *see also* Dkt. No. 17-13 at 2-3. Notwithstanding Defendants' representation to Plaintiffs that they would cease and desist their illegal counterfeiting and infringing activity, they have failed to do so. *See id.* at ¶ 53; Dkt. No. 17-14 at 2.

Plaintiffs claim that Defendants have engaged in the counterfeiting and infringing activities knowingly, willfully, and intentionally, or with reckless disregard or willful blindness to Plaintiffs' rights, or with bad faith, for the purpose of trading on Plaintiffs' goodwill and reputation and the goodwill and reputation of Plaintiffs' Trademarks and products. *See* Dkt. No. 17 at ¶ 54. The amended complaint claims that Defendants' activities are likely to create confusion, a false impression, or deceive consumers into believing that there is a connection or association between their infringing counterfeit products and Plaintiffs' authentic products. *See id.* at ¶ 55.

The amended complaint further alleges that Defendants currently advertise, promote, and offer to sell Dentsply products on the website www.tradekey.com. *See id.* at ¶ 57. Defendants' advertisement states, in pertinent part, "'WE SELL RIGHT NOW the different dental supplies/ cosmetic dentistry/ endodontic materials/ from 3M, DENTSPLY . . . CAD CAM technology hand and rotary endodontic instruments. We sell just original products in original package. Every

month we are [sic] propose special and promo. Many items is [sic] present stocks.'" *Id.*; *see also* Dkt. No. 17-15 at 2. Further, Plaintiffs contend that, upon information and belief, Defendants advertise, promote, and offer to sell, sell, and have sold counterfeits of Plaintiffs' products that use Plaintiffs' Trademarks on other internet sites. *See id.* at ¶ 58.

Plaintiffs argue that the counterfeit and infringing dental products bearing Plaintiffs' Trademarks appear initially as the original, but upon further inspection, it is clear that the packaging and the instruments promoted and sold by Defendants are counterfeits and are of lesser quality than the dental products manufactured and sold by Plaintiffs. In fact, when Dentsply Maillefer conducted its test, it noted that "[t]he results of this investigation showed high level of similarities when [we] compared the investigated files to the original version[,]" noting the following similarities: (1) NiTi active part coupled with a nickel plated rotary shaft with colour ring and a blue silicone stop similar to the original one; (2) similar double S cross section; (3) same grinding quality as the original one; (4) same silicone stop shape and colour as the original one; and (5) same handle geometry with the same number of ring and same colour ring. *See id.* at ¶ 59; Dkt. No. 17-8 at 32.

As such, purchasers of Defendants' counterfeit and infringing products have been, and likely will continue to be, confused and disappointed with the counterfeits, believing that they have purchased genuine products manufactured and sold by Plaintiffs. *See* Dkt. No. 17 at ¶ 60. As a result of Defendants' infringement, Plaintiffs are suffering a loss of the goodwill and reputation they have created in Plaintiffs' Trademarks and brand products and are losing profits from the lost sales of the genuine products. *See id.* at ¶ 61. Finally, Plaintiffs claim that, in addition to the irreparable harm to Plaintiffs, including to their goodwill and reputation, Defendants infringement also has caused a substantial likelihood of irreparable harm to the

public.  *See id.* at ¶ 62.  The counterfeit and infringing products are of inferior quality, already have caused problems during dental procedures, and will continue to cause such problems, thereby posing a real health risk to the public.  *See id.*

In the amended complaint, Plaintiffs assert the following causes of action: (1) counterfeiting and infringement of registered trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1); (2) false designation of origin, trademark infringement and false advertising in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a); (3) deceptive acts and practices and false and misleading advertising in violation of New York General Business Law §§ 349 and 350; (4) trademark infringement in violation of New York State common law; (5) unfair competition in violation of New York State common law; and (6) unjust enrichment. *See* Dkt. No. 17 at ¶¶ 63-112.

In their amended complaint and motion for default judgment, Plaintiffs seek the following relief: (1) a default judgment; (2) a statutory damage award pursuant to Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), based on Defendants' willful infringement, failure to appear, and contemptuous conduct; (3) a permanent injunction consistent with the terms of the previously-entered preliminary injunction; (4) enforcement of the Court's preliminary injunction and expedited discovery order including, but not limited to (a) immediately shut down the websites that advertise the inferior knock-off products and (b) appear before the Court on a date certain with responsive documents and written responses to Plaintiffs' expedited discovery requests and submit to examination under oath regarding Plaintiffs' claims including, but not limited to, identifying Defendants' customers and sources of the inferior counterfeit and infringing products; (5) reasonable attorneys' fees pursuant to statute; and (6) post-judgment interest.  *See* Dkt. No. 42-2 at 8-9.

11

### III. DISCUSSION

**A.      Liability**

"Generally, 'Federal Rule of Civil Procedure 55 provides a two-step process that the Court must follow before it may enter a default judgment against a defendant.'" *United States v. Simmons*, No. 5:10-CV-1272, 2008 WL 685498, *2 (N.D.N.Y. Mar. 2, 2012) (quoting Robertson v. Doe, No. 05-CV-7046, 2008 WL 2519894, *3 (S.D.N.Y. June 19, 2008)). "'First, under Rule 55(a), when a party fails to "plead or otherwise defend . . . the clerk must enter the party's default."'" *Id.* (quotation omitted); *see also* Fed. R. Civ. P. 55(a). "'Second, pursuant to Rule 55(b)(2), the party seeking default is required to present its application for entry of judgment to the court.'" *Id.* (quotation omitted). "'Notice of the application must be sent to the defaulting party so that it has an opportunity to show cause why the court should not enter a default judgment.'" *Id.* (quotation omitted); *see also* Fed. R. Civ. P. 55(b)(2).

"When a default is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability." *Bravado Int'l Group Merch. Servs. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 188 (E.D.N.Y. 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). "While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (citations omitted); *see also Bravado Int'l*, 655 F. Supp. 2d at 189-90 (citation omitted). "[E]ven upon default, a court may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages that are sought." *Overcash v. United Abstract Group, Inc.*, 549 F. Supp. 2d 193, 196 (N.D.N.Y. 2008) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). "The

burden is on the plaintiff to establish its entitlement to recovery." *Bravado Int'l*, 655 F. Supp. 2d at 189 (citing *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158). "While 'the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing.'" *Id.* at 190 (quotation omitted).

When seeking a default judgment, the Local Rules require the party to submit an affidavit attesting to the following:

> 1. The party against whom it seeks judgment is not an infant or an incompetent person;

> 2. The party against whom it seeks judgment is not in the military service, or if unable to set forth this fact, the affidavit shall state that the party against whom the moving party seeks judgment by default is in the military service or that the party seeking a default judgment is not able to determine whether or not the party against whom it seeks judgment by default is in the military service;

> 3. The party has defaulted in appearance in the action; [and]

> 4. Service was properly effected under Fed. R. Civ. P. 4. . . .

N.D.N.Y. L.R. 55.2(a).

In the present matter, the Court finds that Plaintiffs have complied with the procedural requirements necessary for the Court to grant their motion for default judgment. Specifically, Plaintiffs have affirmed that Defendants are not infants or incompetent persons and that they are not in military service. *See* Dkt. No. 42-3 at ¶ 18. Moreover, Defendants have defaulted in this action. Finally, Defendants were personally served with the summons and complaint on July 7 and 8, 2016. *See* Dkt. Nos. 14-16.[3]

---

[3] As to Defendant LIK Supply, the summons and complaint were served on Defendant Kagan, who is designated by law to accept service of process on behalf of the corporation. *See* Dkt. No. 15.

"The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir. 1987). "Confusion giving rise to a claim of trademark infringement includes [but is not limited to] confusion as to 'source, sponsorship, affiliation, connection or identification.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006) (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005)). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.*

Pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(l)(a), trademark infringement exists where a person uses in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark, without the registrant's consent, in connection with the sale, offering for sale, distribution or advertising of any goods or services, where such use is likely to cause confusion, or to cause mistake or to deceive. "The essential question in any case of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 924 (S.D.N.Y. 1981).

In order to establish a claim for trademark infringement, a plaintiff must show: (l) ownership of a valid mark entitled to the protection of the law; and (2) that the defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the defendant's goods. *See Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006) (citing *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004)); *see also E.G.L. Gem Lab*

14

*Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 292 (S.D.N.Y. 2000) ("The likely confusion may relate to the source of the product . . . or to affiliation with or sponsorship of the alleged infringer by the trademark owner").

Once a trademark is registered by the United States Patent and Trademark Office ("PTO"), the registration serves as *prima facie* evidence of the mark's validity. *See* 15 U.S.C. § 1115(a); 15 U.S.C. § 1057(b); *see also Fusco Grp., Inc. v. Loss Consultants, Int'l, Inc.*, 462 F. Supp. 2d 321, 327 (N.D.N.Y. 2006). Dentsply holds registrations for the trademarks at issue in this case with the PTO. *See* Dkt. No. 6-3 at 1-43. As such, Plaintiffs' have satisfied the first element of their trademark infringement claim.

As to the second element, the amended complaint alleges that Defendants have engaged, and continue to engage, in the infringement of fifteen of Plaintiffs' Trademarks, including by the sale of counterfeit goods that bear those Trademarks. *See* Dkt. No. 17 at ¶¶ 22, 29. Generally, in determining the likelihood of confusion, courts in the Second Circuit are obliged to consider the eight factors set forth by Judge Friendly in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961):

> (i) the strength of the plaintiff's mark;
>
> (ii) the similarity of the parties' marks;
>
> (iii) the proximity of the parties' products in the marketplace;
>
> (iv) the likelihood that the plaintiff will bridge the gap between the products;
>
> (v) actual confusion;
>
> (vi) the defendants' intent in adopting their mark;
>
> (vii) the quality of the defendants' product; and
>
> (viii) the sophistication of the relevant consumer group.

15

*Id.* at 495–96; *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006).

Here, as discussed more fully above, Plaintiffs have provided significant evidence of a likelihood of confusion between their products and Defendants' allegedly infringing products. Plaintiffs contend that their trademarks are well known as a result of their longstanding businesses and global products recognition. In its amended complaint, Plaintiffs state that "[s]ince Dentsply's formation in 1899, it has grown into the largest manufacturer of professional dental products and technologies in the world. With operations in 40 countries, Dentsply distributes its dental products in over 120 countries under some of the most well-established brand names in the dental industry."

The similarity of the parties' marks are nearly identical, and require close laboratory analysis to determine the allegedly counterfeit products from the authentic ones. Nicolas Crevoisier, a laboratory engineer trained by Plaintiff Maillefer and familiar with its products, stated that, upon an initial examination, "the counterfeit instruments appeared to [him] to be originals." It was only after additional laboratory testing that Mr. Crevoisier discovered that Defendants' products were of a "significantly less" quality than Plaintiffs'. Moreover, Dr. Zeppenfeld, an accomplished endodontist, required close examinations under a microscope to discover the differences between the products. Accordingly, even to well-trained individuals, the marks appear to be nearly identical without close laboratory examinations. Thus, it is highly unlikely that an unsuspecting or untrained purchaser of the products would have any recognition that Defendants' products are not authentic.

The proximity of the parties' products in the marketplace create a significant likelihood of confusion. When dental supplier MD Trade purchased what it thought were Plaintiffs' authentic

products, the packages that it received from Defendants contained a mix of counterfeit and original products.  Further, the dentists that used these products received both counterfeit and original products in the same shipments.  Accordingly, Defendants' allegedly counterfeit products are intermixed and shipped together with Plaintiffs' authentic products, making it nearly impossible for an unsuspecting purchaser to know what product he or she is receiving.

Plaintiffs have established that there has been actual confusion between the parties' products both by dental suppliers and by the dentists who actually use the products.  Supplier MD Trade was confused by Defendants' product when it purchased what it thought were approximately 1,100 authentic blister packs from VDW.  In reality, this shipment contained only 150 authentic products and the remaining 950 were Defendants' allegedly counterfeit products. Moreover, Dr. Zeppenfeld stated that he and his colleagues used Defendants' products on their dental patients, believing that they were authentic products.  Thus, there has been actual confusion by the purchasing public between the parties' products.

Defendants' intent in adopting Plaintiffs' marks appears to be for the purpose of making a profit by selling what is purported to be a high quality product at a significantly discounted price. Further, Defendants' appear to be attempting to deceive their customers into thinking that they are purchasing Plaintiffs' authentic products.  In an emailed products catalogue, Defendants promoted "ORIGINAL!!" products purporting to be from Plaintiffs.  *See* Dkt. No. 6-3 at 66.  Further, in their tradekey.com website, Defendants state that "[w]e sell just original products in original package."  In an email to Plaintiffs, Defendants acknowledge that they are not selling original products and state that they believe their business is an "absolutely normal practice." Accordingly, the advertisements and communications between the parties demonstrate that

Defendants are attempting to deceive the public into purchasing what are purported to be genuine dental products at a discounted price.

After extensive laboratory testing, Plaintiffs' laboratory engineers determined that "the quality of [Defendants'] counterfeit instruments is significantly less than Plaintiffs' authentic instruments" and they are "less resistant to fatigue than the originals [and] pose[] a higher risk of instrument fracture due to fatigue." Moreover, Dr. Zeppenfeld stated that he and his colleagues likely experienced at least four negative experiences with Defendants' products that led to complications with dental procedures. Thus, the Court finds that Plaintiffs have established that Defendants' counterfeit products are of a substantially lesser quality than their authentic counterparts. Accordingly, the Court finds that the amended complaint satisfies the second element of Plaintiffs' trademark infringement claim.

Based on the foregoing, the Court grants Plaintiffs' motion for default judgment as to the trademark infringement cause of action.[4]

**B.     Damages**

The Lanham Act permits a plaintiff to elect statutory damages at any time prior to the entry of final judgment where a defendant has made "use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of good or services." 15 U.S.C. § 1117(c).

---

[4] Although the amended complaint asserts six causes of action, in its motion for default judgment Plaintiffs have only requested damages relating to their claims against Defendants for willful trademark infringement. *See* Dkt. No. 42-2 at 10-12. As such, in evaluating whether Plaintiffs have established a valid cause of action, the Court considered Defendants' liability only as to the trademark infringement claim. *See Coach, Inc. v. O'Brien*, No. 10 Civ. 6071, 2011 WL 6122265, *7 (S.D.N.Y. Nov. 28, 2011) (citations omitted); *see also Coach Servs., Inc. v. K Ya Int'l, Inc.*, No. 09 Civ. 4656, 2010 WL 2771897, at *2 (S.D.N.Y. June 10, 2010) ("In connection with this inquest, the plaintiff has requested damages only for trademark infringements in violation of the Lanham Act, and therefore liability need only be considered with respect to that claim"), *adopted by*, 2010 WL 2771907 (S.D.N.Y. July 12, 2010).

Although courts have discretion in determining the precise amount of statutory damages, the statute prescribes that a minimum of $1,000 and maximum of $200,000 shall be assessed "per counterfeit mark per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c)(1). For incidents of willful counterfeiting, however, a court may assess statutory damages of up to $2,000,000 "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2).

Initially, the Court finds that, through their default, Defendants' infringement is deemed willful. *See Coach, Inc. v. O'Brien*, No. 10 Civ. 6071, 2011 WL 6122265, *8 (S.D.N.Y. Nov. 28, 2011) (citing *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003)) (other citation omitted); *see also Chloe v. Zarafshan*, No. 06 Civ. 3140, 2009 WL 2956827, *7 (S.D.N.Y. Sept. 15, 2009) ("Willfulness may be established by a party's default because an innocent party would presumably have made an effort to defend itself"). Additionally, Defendants' willfulness is apparent from the conduct set forth in the amended complaint and the motion for default judgment. After being directed to cease and desist their illegal conduct, Defendants continued to offer the counterfeit products for sale, despite representing to Plaintiffs' counsel on January 14, 2015 that they would stop. *See* Dkt. Nos. 17-13 & 17-14. Additionally, even after this Court ordered Defendants to discontinue its infringing conduct, Defendants failed to take down websites that offered the infringing products.

As Plaintiffs correctly contend, Defendants' illegal conduct is precisely the type of conduct Congress sought to deter by providing statutory damages under the Lanham Act. Counterfeiters typically do not keep adequate business records from which actual damages can be ascertained. *See, e.g.*, *Guess?, Inc. v. Gold Center Jewelry*, 997 F. Supp. 409, 411 (S.D.N.Y. 1998) (noting that Congress' decision to make statutory damages available as an alternative to

actual damages "reflected a harsh reality – counterfeiters often do not keep or secrete records of their unlawful activities, thus making proof of the extent of the plaintiff's injury or the counterfeiters' profits impossible as a practical matter"); *All–Star Marketing Group, LLC v. Media Brands Co., Ltd.*, 775 F. Supp. 2d 613, 620–21 (S.D.N.Y. 2011) ("The rationale for § 1117(c) is the practical inability to determine profits or sales made by counterfeiters") (citations omitted). Although Section 1117 provides for statutory damages, it "does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what 'the court considers just.'" *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004), *abrogated on other grounds by, Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012). Despite this lack of guidelines, "courts have found some guidance in the caselaw of an analogous provision of the Copyright Act, 17 U.S.C. § 504(c), which also provides statutory damages for willful infringement." *Id.* (citations omitted). Under the statutory-damages framework articulated by the Second Circuit in *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) ("Fitzgerald" ), courts consider: (1) "the expenses saved and the profits reaped;" (2) "the revenues lost by the plaintiff;" (3) "the value of the copyright" or, by analogy, trademark; (4) "the deterrent effect on others besides the defendant;" (5) "whether the defendant's conduct was innocent or willful;" (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced;" and (7) "the potential for discouraging the defendant." *Duty Free Apparel*, 315 F. Supp. 2d at 520 (citing *Fitzgerald*, 807 F.2d at 1117); *see also All–Star Marketing Group*, 775 F. Supp. 2d at 622–23 (applying the test for statutory damages in trademark action subsequent to the defendants' default); *Tiffany (NJ)*, 282 F. Supp. 2d at 125 (same); *Melendez*, 2011 WL 4542971, at *6-*7 (same).

In the present matter, Plaintiffs ask the Court to award the maximum amount of statutory damages, *i.e.*, $2,000,000 per counterfeit mark, per type of goods, or $30,000,000. Although Plaintiffs acknowledge that the maximum statutory award is reserved for the more egregious cases, they argue that this case fits squarely within that category. *See* Dkt. No. 42-2 at 14. Specifically, Plaintiffs contend as follows:

> Defendants have effectively thumbed their noses at the Court and Plaintiffs at every step in these proceedings. Not only have Defendants failed to respond to the Verified Amended Complaint, they failed to respond to this Court's Show Cause Order, and have willfully failed to comply with this Court's Preliminary Injunction and Expedited Discovery Order and Plaintiff's requests for production of documents and interrogatories. In so doing, Defendants have refused to take down the websites that advertise and infringe on the Asserted Trademarks in contempt of the PI Order (see Exhibit A) and have refused to provide any identifying information regarding the source(s) of the infringing products. By withholding their sources, the inferior dental products continue to flood the marketplace and put patients at serious risk. Thus, Defendants' willful infringement is exacerbated by their contempt for this Court's authority and orders. Such willful defiance – particularly in light of the health risks associated with the inferior products remaining in the marketplace – justify the maximum statutory award.

*Id.* at 14-15 (citations omitted).

Although the Court generally agrees with Plaintiffs' contentions, the Court does not believe that the evidence before the Court warrants the imposition of the maximum statutory award. First, while the exact scale of Defendants' operation is not entirely clear, it appears to be extremely modest, with Defendants Kagan and Pakhomov as the only employees of LIK Supply. As such, Plaintiffs requested award does not appear to be commensurate with the scale of Defendants' sales. *See Duty Free Apparel*, 315 F. Supp. 2d at 520 (holding that "statutory damages 'should be woven out of the same bolt of cloth as actual damages'"); *Melendez*, 2011 WL

4542971, at *7 ("I believe it is desirable that an award of statutory [damages] be tied to some rough estimate of the actual damages that would be recoverable").

Courts frequently issue awards far below the statutory maximum on a per mark basis even where, as here, "the defendant willfully infringes on the plaintiff's mark and fails to stop such behavior after being put on notice by the plaintiff or the court, [although] there is no concrete information about the defendant's actual sales figures and profits and the estimate of plaintiff's lost revenue." *All–Star Marketing Group*, 775 F. Supp. 2d at 624 (citing cases); *see also Coach Servs., Inc. v. K Ya Int'l, Inc.*, No. 09 Civ. 4656, 2010 WL 2771897, *3 (S.D.N.Y. June 10, 2010) (deeming damages award of $20,000–$6,667 per infringement—sought by Coach "appropriate [trademark infringement] award, as it effectively serves both the punitive and deterrent purposes of 15 U.S.C. § 1117(c)"); *Cartier Int'l B.V. v. Ben–Menachem*, No. 06 Civ. 3917, 2008 WL 64005, *15 (S.D.N.Y. Jan. 3, 2008) (holding that $50,000 statutory damages for each of nineteen counterfeited marks was "sufficient to meet the goals of [15 U.S.C. § 1117(c)], including compensating the Plaintiffs and deterring future violations"); *Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc.*, No. 03 Civ. 2132, 2006 WL 728407, *6 (S.D.N.Y. Mar. 21, 2006) (holding that where the plaintiff did not provide the court with any information about the corporate defendant's business, "market in which [the defendant] sold or is continuing to sell counterfeit products, or any estimate of the volume of products bearing the plaintiff's marks sold by the defendant [,]" $125,000 per infringed mark was appropriate because that amount would sufficiently "impress upon [defendant] that there are consequences for its misconduct" and would "serve as a specific deterrent to [defendant] and as a general deterrent to others who might contemplate engaging in infringing behavior in the future"). This logic, and the application of the *Fitzgerald* framework, suggest that Plaintiffs' requested damage award is inappropriate.

22

In the present matter, the Court finds that an award of $60,000 per infringement is appropriate. This award sufficiently compensates Plaintiffs for their lost revenue and will serve as a sufficient deterrent against any such future conduct. Further, the Court finds that this amount is appropriate considering the risk to public health caused by Defendants' conduct. Moreover, given Defendants' refusal to participate in discovery or even the defense of this matter, it is unlikely that the Court would ever be capable of determining the amount of actual losses suffered by Plaintiffs and Plaintiffs should not be punished for this. The Court is persuaded that this award, when combined with the extensive injunctive relief ordered below, serves both the punitive and deterrent purposes of 15 U.S.C. § 1117(c).

Based on the foregoing, the Court orders that Defendants shall pay $60,000 per instance of infringement, for a total award of $900,000.[5]

## C.    Permanent Injunction

Plaintiffs request a permanent injunction enjoining Defendants from: (1) offering for sale, sale, distribution, or advertising of any goods that use any reproduction, counterfeit, copy or colorable imitation of one or more of Plaintiffs' trademarks; (2) passing off, inducing or enabling others to sell or pass off any product as a product produced or authorized by Plaintiffs, which is not produced or authorized by Plaintiffs; (3) shipping, delivering, distributing, or returning any items currently in Defendants' possession or control which bear any of Plaintiffs' registered trademarks; (4) manufacturing or labeling of containers bearing any of the registered trademarks, or the creation of advertising display material bearing any of Plaintiffs' trademarks; and (5) continuing to perform in any manner whatsoever any acts which infringe Plaintiffs' registered

---

[5] As discussed below, the Court finds that this award is intended to compensate Plaintiffs not only for their statutory damages but also for their attorneys' fees and costs associated with this action.

trademarks or attempt to pass-off counterfeit products purporting to be Plaintiffs' products. *See* Dkt. No. 42-2 at 13-14.

Where a violation of the Lanham Act has occurred, a court may issue a permanent injunction "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006).

In the present matter, Plaintiffs have satisfied the requirements necessary for the Court to grant permanent injunctive relief. Plaintiffs have established the first element because they have suffered an irreparable harm because Defendants' unauthorized use of Plaintiffs' Trademarks is likely to cause confusion. *See Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997) ("In the context of trademark and unfair competition injunctions, the requirement of irreparable harm carries no independent weight, as we have held that a showing of likelihood of confusion . . . establishes irreparable harm"). It is evident that Defendants' unauthorized use of Plaintiffs' Trademarks caused confusion because the counterfeit products were purchased by dental distributors who believed the products to be authentic, and the counterfeit products were sold to doctors who used the inferior instruments on their patients. *See* Dkt. No. 17 at ¶¶ 34-40.

Plaintiffs have established the second element because, without a permanent injunction, Defendants are likely to continue their infringing conduct. Despite the July 15, 2016 Memorandum-Decision and Order prohibiting Defendants from offering to sell products that use any reproduction of Plaintiffs' Trademarks, Defendants maintain web pages on the Trade Key digital marketplace which offer to sell Dentsply and "mailifier" dental products. *See* Dkt. No. 32. This disobedience, combined with the fact that on several occasions, Defendants infringed upon Plaintiffs' Trademarks by selling counterfeit products on the internet, supports the inference that Defendants will continue their illegal conduct. *See Elec. Creations Corp. v. Gigahertz, Inc.*, No. 5:12-CV-1423, 2013 WL 3229125, *5 (N.D.N.Y. June 25, 2013) (indicating that infringing trademarks on numerous occasions supports the inference that without a permanent injunction, a defendant will likely continue his or her illegal conduct). The harm to the value and reputation of Plaintiffs' Trademarks caused by Defendants' unauthorized use of Plaintiffs' Trademarks cannot readily be quantified; thus, injunctive relief is appropriate because the remedies available at law are inadequate to compensate Plaintiffs for their injuries. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming that injunctive relief is appropriate where monetary damages are difficult to establish and measure).

Plaintiffs have established the third element because the balance of hardships between the plaintiff and defendant is such that a remedy in equity is warranted. Plaintiffs suffer a hardship in being deprived of its legal rights through Defendants' unauthorized use of their trademarks, while Defendants suffer no hardship in being required to comply with the Lanham Act. *See Elec. Creations Corp.*, 2013 WL 3229125, at *5.

Finally, Plaintiffs have established the fourth element because a permanent injunction in this case would serve the public interest, as the enforcement of federal trademark law "'secure[s]

the public's interest in protection against deceit as to the source of its purchases.'" *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir. 1995)).

Based on the foregoing, the Court grants Plaintiffs' application for permanent injunctive relief.

**D.      Attorneys' Fees and Expenses**

Under the Lanham Act, a prevailing plaintiff is entitled to the costs of the action, and courts "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Second Circuit has defined exceptional cases justifying an award of attorneys' fees as cases demonstrating "instances of 'fraud or bad faith,' or 'willful infringement.'" *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003) (citations omitted).

In the present matter, Plaintiffs request that their "reasonable attorneys' fees and costs be considered in the Court's calculation of statutory damages." Dkt. No. 42-2 at 18-19 (citation omitted). The Court finds that an award of attorneys' fees and expenses is appropriate given Defendants' continued willful infringement. Further, the Court finds that the total amount awarded above is an appropriate amount to compensate Plaintiffs for their statutory damages and attorneys' fees and costs. *See Diesel S.P.A. v. Does*, No. 14-cv-4592, 2016 WL 96171, *12 (S.D.N.Y. Jan. 8, 2016) (finding a total award of $2,000,000, encompassing statutory damages and attorneys' fees and costs, appropriate); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108-09 (2d Cir. 2012) (holding that attorneys' fees and costs are available even when the plaintiff receives statutory damages under 15 U.S.C. § 1117(c)).

**E.      Responses to Plaintiffs' Expedited Discovery Requests**

In addition to the relief discussed above, Plaintiffs seek responses to their discovery requests. "Of particular immediacy is the need to know the extent and scope of Defendants' infringement as well as all other companies and individuals who are in active concert or participation with Defendants, including the manufacturer(s), supplier(s), and other source(s) of the infringing products." Dkt. No. 42-2 at 19. Accordingly, Plaintiffs "respectfully request that this Court exercise its inherent authority to either (1) order Defendants to personally appear in Court with the documents and discovery responses on a date certain and submit to examination under oath regarding Plaintiffs' claims including, but not limited to, identifying Defendants' customers and sources of the inferior counterfeit and infringing products, or (2) have a sheriff – at Defendants' cost – retrieve the documents and discovery responses from Defendants at their residences and/or place of business and submit to a telephonic examination under oath, overseen by the Magistrate Judge." *Id.* at 20.

At this point, the Court is not prepared to grant the relief Plaintiffs seek. The relief Plaintiffs seek is overbroad and could, at least in part, be moot upon the Court's granting the requested permanent injunction.

Based on the foregoing, the Court denies without prejudice Plaintiffs' request for expedited discovery requests.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, Plaintiffs' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for default judgment is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs are awarded a total award of $900,000, comprising statutory damages, attorneys' fees and costs; and the Court further

**ORDERS** that Plaintiffs' request for a permanent injunction is **GRANTED**; and the Court further

**ORDERS** that Defendants, and their officers, agents, employees, assigns, successors-in-interest, and attorneys, and all those persons or entities in active concert or participation with Defendants who receive notice of this order are permanently enjoined and restrained from:

(i) using in commerce, in connection with the offering for sale, sale, distribution, or advertising of, any goods that use any reproduction, counterfeit, copy, or colorable imitation of one or more of Plaintiffs' Trademarks, including the words DENTSPLY®, Mtwo®, WaveOne®, WaveOne® design and logos, RECIPROC®, ProTaper®, ProTaper Next®, VDW®, Flexofile®, Endo Easy Efficient®, AH Plus Jet®, Maillefer®, ThermaFil®, Colorinox®, and Lentulo® and any related designs and logos, separately or in combination with any reproduction, counterfeit, copy, or colorable imitation of any one or more of the aforementioned trademarks, or any mark likely to be confused with any of Plaintiffs' Trademarks, alone or in combination with any other symbol, symbols, word, or words, in such a manner as is likely to cause confusion, deception or mistake;

(ii) passing off, inducing or enabling others to sell or pass off any product as a product produced or authorized by Plaintiffs, which is not produced or authorized by Plaintiffs;

(iii) shipping, delivering, distributing, returning or otherwise disposing of in any manner, any items currently in Defendants' possession or control (whether goods, instruments, packaging, product parts, labels, documents, or otherwise) which bear any of Plaintiffs' registered trademarks identified in paragraph (i) above, or any copy or reproduction of the registered marks, or any substantially identical mark;

(iv) manufacturing or using any tools, dies, stamping, mixing, embossing, silk screening, printing, or molding equipment, or any other apparatus designed especially for the manufacture or labeling

of unauthorized products bearing any of Plaintiffs' registered trademarks identified in paragraph (i) above, or the manufacturer or labeling of containers bearing any of the registered trademarks, or the creation of advertising display material bearing any of the registered trademarks; and

(v) continuing to perform in any manner whatsoever any acts which infringe Plaintiffs' registered marks identified in paragraph (i) above or attempt to pass-off counterfeit products purporting to be Plaintiffs' products; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Plaintiffs' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 29, 2017
      Albany, New York

Mae A. D'Agostino
U.S. District Judge